**Opinion issued July 16, 2015**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-13-00946-CR

—————————————

## JULIO FRANCISCO GALVAN, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 248th District Court
Harris County, Texas
Trial Court Case No. 1362831

## MEMORANDUM OPINION

A jury found appellant, Julio Francisco Galvan, guilty of aggravated sexual

assault of a child younger than fourteen years of age[1] and assessed his punishment

---

[1]     *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i) (Vernon Supp. 2014).

at confinement for fifteen years. In two issues, appellant contends that his trial counsel provided him with ineffective assistance.

We affirm.

## Background

The complainant testified that on the night of July 10, 2012, when she was twelve years old, she and her brother stayed overnight with their neighbors, appellant's family, while her mother, N.L., went to a hospital. The complainant, her brother, and appellant's three children played video games and watched movies until around midnight. When it was time to go to bed, the complainant shared a bed with appellant's daughter, I.G., who was fifteen years old. Appellant's younger daughter slept on a mattress, which was pushed up against the bed on the floor.

After sleeping for awhile, the complainant awoke and asked I.G. to go with her to the restroom. When they returned to the bedroom, I.G. told her to lock the door. The complainant noted that when she had previously slept over, I.G. had "always" locked the bedroom door. After the complainant was not able to lock the door, she simply went back to sleep.

The complainant later awoke at around 3:00 or 4:00 a.m. when she "felt something." The bedroom door was cracked open, and, in the light coming into the bedroom from the hallway, she saw appellant "sitting on his knees" at the "end

2

of the bed," with his hand "down to [her] private part." The complainant was wearing basketball shorts, and appellant put his hand under her shorts and panties. He then put his finger "in and out of [her] private part" for "about a minute or so." When the complainant moved her legs, appellant got up, left the room, and closed the door. I.G. then awoke and sat up, and the complainant told her what had just happened. I.G. was "mad" and locked the door, and the girls stayed up for awhile until they fell back to sleep.

In the morning, the complainant accompanied I.G. to speak with I.G.'s mother, Nora Galvan, and tell her what had happened. Because the complainant does not speak Spanish and Nora does not speak English, the complainant did not understand what I.G. said to Nora or what Nora said in response. Nora began yelling, however, and she and appellant then had an argument. The complainant and I.G. then went to the complainant's house and told N.L. what had happened.

N.L. testified that at around 9:00 p.m. on July 10, 2012, she called appellant, her neighbor, to ask if he and Nora would watch the complainant and her brother so she could go to a hospital. Appellant agreed, and N.L. walked her children over to appellant's house. At around 11:30 the next morning, the complainant and I.G. arrived at N.L.'s house, acting "embarrassed." The complainant said, "Mom, I have to tell you something," and she told her mother that appellant had "touched her." The complainant explained that "she woke up to appellant putting his fingers

3

inside of her," referring to her "vagina area." N.L. called for law enforcement assistance and took the complainant to a hospital.

Harris County Sheriff's Office Deputy C. Gbunblee testified that at around 3:00 p.m. on July 11, 2012, he was dispatched to N.L.'s house to investigate a sexual assault. Upon his arrival, he spoke with the complainant, who was "scared," and N.L., who was "very upset." Gbunblee then went to appellant's house and spoke with appellant, Nora, and I.G. Appellant explained to him that at approximately 10:00 p.m. the night before, he had told the children to go to sleep. After he went to bed, however, he heard the children making noise. Once he got up, the children got quiet, and he turned off the hallway light and went back to bed.

Children's Assessment Center ("CAC") forensic interviewer L. Holcomb testified that she interviewed the complainant on July 24, 2012 for "16 minutes." The complainant told Holcomb "what happened" in a "matter-of-fact" manner that was "typical" for a child of her age. Holcomb emphasized that it was not her role to determine "whether a child is telling the truth [or] a lie."

Dr. L. Thompson, Jr., CAC Director of Therapy and Psychological Services, testified in general regarding manners of disclosure demonstrated by child victims of sexual assault. And he noted that he was aware of instances in which children had been sexually abused in the presence of other people, including while in the same bed.

4

Appellant testified that a week before the incident, he and Nora had explained to N.L. that they no longer wanted the complainant and her brother to stay overnight at their home because the children liked to stay up "until the early morning hours." He and Nora had allowed N.L.'s children to stay the night of July 10, 2012 only because N.L. needed to go to a hospital. That night, after he and Nora had watched a movie, she went to bed. At around 1:30 a.m., appellant told the children, who were in the living room watching a movie, to go to sleep. After appellant went to bed, he heard "voices" and realized that the children were still awake in I.G.'s bedroom. Appellant then went to I.G.'s bedroom, turned on the hall light, and opened the door. Two of the girls were in the bed, and one was on a mattress on the floor. Because the mattress on the floor blocked the door, appellant could not open the door completely. And he did not go into the room. After "moving" and "laughing," the girls went still, and appellant went back to bed. The next morning, I.G. told Nora that he had touched the complainant.

Nora testified that on the night of the incident, the girls had made noise and she had "yelled" at them to go to sleep. Appellant had to get up at around 4:00 a.m. to go and tell the girls to be quiet. She noted that he was gone "not too long" before returning to bed. Later that morning, after I.G. told her what the complainant had said, she was "surprised" and immediately told appellant, who thought she was "joking."

5

I.G. testified that the complainant had stayed overnight with her about every other week, and her parents no longer wanted the complainant to stay over because she and the complainant stayed awake too late. At around midnight on July 10, 2012, appellant told the girls to go to bed. I.G. explained that her bed was up against a wall and, with the mattress on the floor, one could not walk between the bed and the mattress. She also noted that because of the location of the mattress, the bedroom door could barely be opened, and one had to walk on the mattress to enter the room. When getting into the bed, I.G. and the complainant had had to climb over the footboard of the bed to avoid waking I.G.'s younger sister. After going to bed, I.G. and the complainant continued to talk for thirty to forty-five minutes, and appellant had to again instruct them to go to sleep. However, when he came the second time to tell the girls to go to sleep, appellant did not enter the bedroom. He turned on the hall light, and I.G. saw him and heard him. And she locked the door after he walked away. I.G. further explained that appellant could not have come into the bedroom without her noticing. She emphasized that "at no point did [appellant] enter the room," and she noted that she would have felt it had he gotten onto the bed.

I.G. did not remember getting up with the complainant and going to the restroom. She did remember, however, waking and seeing the complainant crying. After they talked, they went back to sleep. The next morning, I.G. told Nora what

6

the complainant had said had happened. And Nora then spoke with appellant. After appellant left, I.G. and the complainant went to the complainant's house and told N.L.

In the State's rebuttal, J.K. McManemy, M.D., testified that she examined the complainant at the hospital on July 11, 2012. She explained that although she found no bruising, lacerations, or abrasions on the complainant during the examination, none were expected based on the allegation of digital penetration. The trial court admitted into evidence the complainant's medical records pertaining to the examination. And M. Miller, appellant's neighbor, testified that appellant had admitted to her after the incident that he had gone into I.G.'s bedroom. He explained, however, that he had just patted the complainant on the head.

### Standard of Review

To establish a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's

performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. However, the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*

**Ineffective Assistance of Counsel**

In his first and second issues, appellant argues that his trial counsel's performance was deficient during the guilt phase of trial because counsel (1) impanelled two jurors who had each voiced bias against the defendant; (2) failed to test the competency of the complainant; (3) failed to object to hearsay; (4) failed to properly object to evidence of an extraneous bad act; (5) failed to request prior statements from testifying witnesses; (6) failed to voir dire the State's experts; (7) elicited hearsay testimony; (8) failed to file or obtain rulings on pre-trial motions; and (9) failed to preserve error regarding a variance between the indictment and the jury charge. Further, appellant argues that his trial counsel's performance was deficient during the punishment phase of trial because counsel failed to present any mitigating evidence.

### *Juror Bias*

In regard to appellant's assertion that his trial counsel failed to challenge or strike two veniremembers who expressed bias against him, we note that the Texas Court of Criminal Appeals has stated that the Sixth Amendment right to an impartial jury is "subject to waiver (or even forfeiture) by the defendant in the interest of overall trial strategy." *State v. Morales*, 253 S.W.3d 686, 697 (Tex. Crim. App. 2008). The Texas Legislature has expressly made a defendant's right to challenge a prospective juror for cause on the basis of an actual bias subject to

9

waiver. *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 35.16(9), (11) (Vernon 2006) ("No juror shall be impaneled when it appears that the juror is subject to the second, third or fourth grounds for challenge for cause set forth above, although both parties may consent. All other grounds for challenge may be waived by the party or parties in whose favor such grounds of challenge exist.").  And because it is a right to be exercised at the option of the defendant, it is also "subject to the legitimate strategic or tactical decision-making processes of defense counsel during the course of trial." *Id.*

Appellant asserts that veniremembers numbers forty-five and forty-eight expressed bias against him during voir dire, as follows:

| [State]: | . . . . [I]n this case, we've alleged penetration of the sexual organ of [the complainant]. Got to prove who the complainant is. I have to prove to you that she's younger than 14 years of age. Okay. By placing his finger, the defendant's finger, in the sexual organ of [the complainant]. Those are my elements. Those are the only things I have to prove. |
|---|---|
| . . . . | |
| | Okay. A lot of times when I'm talking to jurors on these cases or when the defense stands up, they'll ask you this question: Who can't be fair? And all of a sudden everybody's raising their hands and I can't be fair because what are you thinking?  I don't like this kind of case.  I think this is horrible. . . . But when you say you can't be fair, I'm going to define that. |

> What you're saying is that before you have heard a single shred of evidence, before you have heard a witness, before you have seen a map, before any of that, you've already decided what you're going to do in this case. You have some sort of telepathy and you know what's going to happen and you know what your verdict will be. Okay? Is there anybody here who feels that way? I can't be fair. I don't care what the evidence shows, I simply cannot follow the law.

. . . .

VENIREPERSON: 45.

[State]: 45.

VENIREPERSON: 48.

[State]: 48.

Trial counsel did not challenge for cause or exercise a peremptory strike against either venireperson, and both served on the jury.

In *Delrio v. State*, trial counsel for the defendant, who was on trial for possession of cocaine with intent to deliver, did not challenge for cause, or exercise a peremptory strike against, a panel member who had stated during voir dire that he was a former narcotics officer, knew the defendant, and could not be fair and impartial. 840 S.W.2d 443, 443–45 (Tex. Crim. App. 1992). The panel member then served on the jury. *Id.* at 445. The court of criminal appeals explained that although "a single partial juror will vitiate a conviction," the right to trial by an impartial jury is subject to waiver or forfeiture by the defendant in the interest of

11

trial strategy. *Id*. at 445–47. And a "[w]aiver of [a] client's right to insist that every juror in the case be in all things fair and impartial may in counsel's best professional judgment have been an acceptable gamble." *Id*. at 447. The court noted that it could "envision circumstances" under which counsel might have "justifiably chosen not to exercise a challenge for cause or peremptory strike against a venireman who deemed himself incapable of serving on the jury in a fair and impartial manner." *Id.* at 446. The court then held that on a record that did not contain counsel's reasoning, it "must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066).

Here, although veniremembers forty-five and forty-eight expressed actual bias against appellant, this alone, according to the Texas Court of Criminal Appeals, is not sufficient to overcome the presumption that appellant's trial counsel exercised reasonable professional judgment during jury selection. *See id.* And the record is silent regarding the motivations of counsel in not challenging or striking veniremembers forty-five and forty-eight. *See id.*; *see also Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994) (noting silent record regarding trial counsel's motivations in not challenging or striking juror who had

12

expressed bias against defendant failed to rebut presumption of effective assistance).

In support of his argument that his trial counsel's performance should be presumed ineffective because no sound strategy could justify counsel's failure to challenge the venirepersons, appellant relies on *Nelson v. State*, 832 S.W.2d 762, 766–67 (Tex. App.—Houston [1st Dist.] 1992, no pet.). This Court has disavowed *Nelson*, however, as predating the holdings of the court of criminal appeals in *Jackson* and *Delrio*. *See Bratcher v. State*, No. 01-08-00610-CR, 2009 WL 1331344, at *3 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op., not designated for publication) (citing *Parish v. State*, No. 01–96–00279–CR, 1997 WL 760611, at *2 (Tex. App.—Houston [1st Dist.] Nov. 26, 1997, no pet.) (mem. op., not designated for publication)).

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he failed to challenge or strike veniremembers number forty-five and forty-eight. *See Delrio*, 840 S.W.2d at 446.

*Competency*

Appellant next argues that his trial counsel should have, but "failed to test the competency" of the complainant, who was "the State's only witness with personal knowledge," because he had notice that the complainant "saw a

neurologist" and took a prescription medication that affected "all of her body's systems and is prescribed for bipolar disorder."

A witness is competent to testify if she (1) can intelligently observe events at the time of their occurrence, (2) has the capacity to recollect those events, and (3) has the capacity to narrate those events to the jury. *See Hogan v. State*, 440 S.W.3d 211, 213–14 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see also* TEX. R. EVID. 601(a). "The third element involves the ability to understand the moral responsibility to tell the truth, to understand the questions posed, and to frame intelligent answers." *Hogan*, 440 S.W.3d at 214. Children "shall be incompetent to testify" if, "after being examined by the court, [they] appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated." *Gilley v. State*, 418 S.W.3d 114, 120 (Tex. Crim. App. 2014); *see also* TEX. R. EVID. 601(a)(2). Moreover, a trial court may inquire as to "whether the child-witness possesses the capacity to appreciate the obligations of the oath [to tell the truth while testifying]—or can at least distinguish the truth from a lie." *Gilley*, 418 S.W.3d at 121. Inconsistent or confusing responses from a child do not necessarily mean that the child is incompetent to testify; rather, such matters speak to the credibility of her testimony. *In re A.W.*, 147 S.W.3d 632, 635 (Tex. App.— San Antonio 2004, no pet.).

14

Here, the complainant demonstrated the capacity to recollect events and narrate them to the jury. *See Hogan*, 440 S.W.3d at 213–14. She answered the questions posed to her and offered explanations. *See id.* And she demonstrated an ability to distinguish between the truth and a lie. *See Gilley*, 418 S.W.3d at 121. Appellant does not direct us to any authority to support his assertion that counsel was ineffective for not challenging the complainant's competency to testify on the ground that she had seen a neurologist and was taking a particular prescription medication for a "seizure disorder."

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he "failed to test the competency" of the complainant.

***Hearsay***

In regard to appellant's assertion that his trial counsel "failed to recognize and object to the admissibility of hearsay from two . . . different witnesses about the same alleged event, when neither qualifie[d] as an 'Outcry Witness,'" we note that a hearsay statement made to an outcry witness by a child victim of a sexual offense is admissible. TEX. CODE CRIM. PROC. ANN. art. 38.072 (Vernon Supp. 2014). An outcry witness is the first person over the age of eighteen, other than the defendant, to whom the child made a statement about the offense. *Id.* art. 38.072, § 2(a)(3). The statement must be "more than words which give a general allusion

15

that something in the area of child abuse is going on"; it must be made in some discernable manner and is event-specific rather than person-specific. *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). There may be only one outcry witness per event. *Broderick v. State*, 35 S.W.3d 67, 73–74 (Tex. App.—Texarkana 2000, pet. ref'd). Hearsay testimony from more than one outcry witness may be admissible only if the witnesses testify about different events. *Id.* at 73. To invoke the statutory exception, the party intending to offer the statement must notify the adverse party of the name of the outcry witness and a summary of the testimony, the trial court must conduct a hearing outside the presence of the jury to determine the reliability of the witness, and the child victim must testify or be available to testify at the proceeding. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b)(1)(A–C).

Here, the State gave appellant notice of its intent to offer the complainant's outcry statements through N.L. and Holcomb. *See id.* Appellant argues that N.L. and Holcomb could not qualify as outcry witnesses because the evidence establishes that the complainant first told appellant's daughter, I.G., "who was 18 at the time of trial," about the offense and then together told appellant's wife, Nora. And she notes that the complainant did not tell her own mother, N.L., about the offense until several hours later. Further, Holcomb did not speak with the

16

complainant until thirteen days after the offense had occurred and the complainant had already spoken with I.G. and Nora about the offense.

The State asserts that although it gave notice of intent regarding "two potential outcry witnesses," N.L. and Holcomb, it expressed its intent, prior to the commencement of the guilt phase of trial, to offer only the outcry testimony of N.L. It then "proffered the circumstances around which the outcry was made," and Holcomb "never testified as an outcry witness."

The record shows that the State, at the beginning of trial and outside the presence of the jury, informed the trial court that it had discussed with defense counsel off the record that it intended to present N.L. N.L. then testified about the complainant's disclosure to her of the details of the offense. And the record shows that Holcomb testified only about her observations of the complainant during their interview, and she did not testify about any of the details of the offense that the complainant had related to her. Thus, Holcomb did not testify about the complainant's outcry to her or present any hearsay testimony.

Moreover, because I.G. was not eighteen at the time of the complainant's outcry, I.G. could not be an outcry witness. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a)(3) (defining outcry witness as first person "over the age of 18" to whom child makes statement about offense). And Nora could not be an outcry witness because the complainant did not speak to her about the offense. *See id.*

17

The complainant testified that she does not speak Spanish, Nora does not speak English, and the complainant did not understand anything that I.G. said to Nora or anything that Nora said in response.

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he failed to object to hearsay evidence presented by "two . . . different witnesses" not qualified to testify about the complainant's outcry.

*Extraneous Act*

Appellant next asserts that his trial counsel "improperly objected to the admissibility of extraneous bad act evidence as hearsay, when the State gave notice of its intent to use unredacted medical records containing notes—in the form of hearsay within hearsay—of an unsubstantiated extraneous bad act."

The record shows that the trial court admitted into evidence the records of the complainant's medical examination, which was conducted on July 11, 2012. The records include the following statement taken by hospital personnel: "Social worker consulted to assess patient in EC due to sexual assault. . . . [The complainant's] friend [I.G.] said that her father had done the same thing (touched her vagina) when she was around 13."

Appellant's trial counsel moved "in limine" to exclude as hearsay any testimony by Deputy Gbunblee regarding I.G.'s statements to the complainant

about the extraneous act. After the trial court stated that "the answers to the questions would be hearsay," it then asked whether the statements were "admissible." The State responded, "I think [defense counsel] thinks it would be more prejudicial than probative." And the trial court ruled that the "set of facts that are extraneous to the offense regarding the defendant's having committed the same type of thing against . . . his own daughter is more prejudicial than probative at this point; however, [the State] can ask about the conversation and demeanor, not . . . what was said." *See* TEX. R. EVID. 403.

During trial, when the State attempted to ask about the extraneous act, the trial court sustained defense counsel's hearsay objection. However, when the State offered into evidence the medical records containing the statement about the extraneous act, trial counsel stated that he had no objection "other than [his] previous hearsay objection." The trial court overruled the objection and admitted the record into evidence. Appellant asserts that his trial counsel never made a previous objection to the medical records as containing hearsay. And he did not object to the statement in the records about the extraneous offense on the ground that it was more prejudicial than probative.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation

19

of cumulative evidence. TEX. R. EVID. 403. Here, appellant, in his brief, does not provide any analysis of the factors pertinent as to whether the probative value of the statement about the extraneous offense was substantially outweighed by the danger of unfair prejudice. *See Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (providing factors); *see also Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997) (declining to address defendant's "unarticulated Rule 403 complaints").

Even were we to conclude, however, that the statement about the extraneous act was inadmissible, appellant has neither argued, nor shown a reasonable probability, that the outcome of his trial would have been different had his trial counsel objected to the statement. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2064.

Accordingly, we hold that appellant has not shown that, but for counsel's error in not objecting to the statement about the extraneous act mentioned in the medical records, the result of the proceeding would have been different. *See id.*

### *Failure to Investigate*

In regard to appellant's assertion that his trial counsel "failed to request prior statements for each testifying witness, knowing that each witness gave prior statements," we note,

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the

20

> witness, must order an attorney for the state or the defendant and defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

TEX. R. EVID. 615(a).

At trial, Deputy Gbunblee testified that he had obtained written statements from the complainant and her mother, N.L. Appellant complains that his trial counsel "had no idea whether the statements would be inconsistent and could be used as the basis for impeachment," even though the State, in its pre-trial Notice of Intention to Use Extraneous Offenses and Prior Convictions, suggested that the complainant "gave at least one other inconsistent statement." He asserts that the notice refers to "multiple offenses of penetration and sexual contact between appellant and the [complainant]," stating that offenses occurred on "multiple occasions pursuant to a continuing course of contact." He notes, however, that the medical records state that the complainant's "'hymen is normal,' intact, and had no signs of injury." Appellant argues, thus, that this "should have raised a flag" that the complainant gave inconsistent statements, "at least at some point in the investigation." And had trial counsel moved to obtain these statements, either before or during trial, "the State would have been ordered to turn [them] over" and they "would have served as a viable basis for impeaching the credibility" of the complainant.

21

Nothing in the record, however, establishes that appellant's trial counsel did not actually have in his possession the statements at issue. Further, the State's notice does not concern any statements by the complainant or N.L. And the fact that the medical examination of the complainant did not reveal any evidence of injury does not in any way render the complainant's testimony inconsistent. Dr. McManemy explained that "95 percent of the time," child victims of sexual assault "have no abnormal physical findings on the exam."

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he "failed to request prior statements for each testifying witness."

*Experts*

Appellant next argues that his trial counsel's performance was deficient because counsel "failed to voir dire the State's experts, permitted them to testify without objection, and failed to produce contradicting experts to show that no scientific/forensic evidence of penetration may also be evidence that no offense occurred."

In regard to his assertion that his trial counsel "failed to voir dire the State's experts," Holcomb and Dr. Thompson, appellant notes that a party against whom an expert's opinion is offered "must . . . be permitted" to conduct a voir dire examination of the expert. *See* TEX. R. EVID. 705(b). And he asserts that Holcomb

and Thompson "testified without a single objection from trial counsel." Appellant does not, however, explain why voir dire was needed, nor does he state what objections trial counsel should have made.

In regard to his assertion that his trial counsel "failed to . . . articulate either through cross-examination or defense experts that no evidence of penetration" could constitute "evidence that no offense occurred," appellant notes that the complainant's medical records show that no physical injuries were found on the complainant, counsel failed to thoroughly cross-examine Holcomb and Dr. Thompson, and counsel failed to present expert testimony to contradict them. However, appellant does not state what trial counsel should have asked during cross-examination. *See Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (noting suggestion cross-examination should have been conducted differently "does not rebut the presumption that counsel's conduct fell within the wide range of reasonable professional assistance"). Further, the medical records show that Dr. McManemy explained that although no bruising, lacerations, or abrasions were found on the complainant, no such physical evidence is found in the majority of cases involving digital penetration. Thus, appellant has not demonstrated that expert testimony was necessary to establish that a lack of physical evidence could constitute evidence that no offense occurred.

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he failed to voir dire the State's experts, permitted them to testify without objection, or failed to present "contradicting experts."

### Eliciting Damaging Testimony

Appellant next argues that his trial counsel's performance was deficient because he "illicit[ed] damaging hearsay [testimony] on cross examination" of the State's rebuttal witness, Melissa Miller, as follows:

| [State]: | So when [appellant] told you he did not know what was going on, what else did he say? |
|---|---|
| [Miller]: | He said that [the complainant was] trying to ruin his life. I said, I don't know what you're talking about. He said, she said that I touched her. He said, I didn't do anything. *I went in there to check on her. I patted her on the head. That's all.* I said, I still have no idea what you're talking about. Let me go out and see what's going on. |
| . . . . | |
| [Defense Counsel]: | So when you're talking to him on the phone *or you say that he says that he went into the room, did you ask him whether or not he was checking on his daughters as well*? |
| [Miller]: | No, sir. |
| [Defense Counsel]: | Did he say that he was? |

24

[State]:            Objection, hearsay.

[Trial Court]:      Overruled.

[Defense Counsel]:  You can go ahead and answer the question.

[State]:            Your Honor, pursuant to party opponent, he's not allowed to introduce his client's own statement.

[Trial Court]:      I'm sorry. Approach the bench.

(At the bench)

[State]:            Judge, I'm objecting under hearsay that he is trying to introduce his own client's statement through this witness. I get to do that because the party opponent rules is that he can only introduce his client's statement by putting his client on the stand. That's my objection.

[Trial Court]:      Your objection—the remainder of the content of the conversation you're saying doesn't come in?

[State]:            Unless he puts his client on to say, but he's not allowed to say from this witness, [m]y client said this, didn't he?

[Trial Court]:      I think once you call the witness, the content of the statement comes in.

[State]:            Okay.

[Trial Court]:      The good and the bad.

25

| | |
|---|---|
| [State]: | Okay. Overruled |

(End of Bench Discussion)

| | |
|---|---|
| [Defense Counsel]: | *. . . I was asking you whether or not [appellant] mentioned also whether he was checking on his own daughters as well?* |
| [Miller]: | *I don't remember. He had told me that there was a light on and he was flipping the light off, so.* |
| [Defense Counsel]: | *You recall him mentioning that the light that he flipped on and off was out in the hallway?* |
| [Miller]: | *No. It was in the bedroom.* |
| [Defense Counsel]: | And you've already said that you personally did not ask him whether or not he was checking on his girls as well? |
| [Miller]: | No. |

(Emphasis added.) Appellant asserts that the above cross examination placed him inside the girls' bedroom, in direct contradiction to his own testimony that he turned on the hallway light, not the bedroom light, and stayed in the hallway because the bedroom door was blocked by a mattress.

However, as revealed above, Miller, under direct examination by the State had already testified that appellant had told her that he went in to the bedroom "to check on" the complainant and "patted her on the head." The State asserts that appellant's trial counsel, through cross examination, was merely attempting to

26

mitigate the effects of Miller's testimony by trying to corroborate appellant's testimony and show that in checking on the complainant "and his own daughters as well," he acted as would a "reasonable father and caretaker."

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he "illicit[ed] damaging hearsay [testimony] on cross examination."

### Pretrial Motions

In regard to appellant's assertion that his trial counsel "submitted another lawyer's pretrial motions and then failed to request a ruling on the motions." The record does show that trial counsel substituted in on April 10, 2013 and was appellant's third attorney in the case. On April 12, 2013, a motion in limine, motion for discovery, and request for notice of the State's intent to use evidence of extraneous offenses at trial were filed, apparently by appellant's previous counsel. Appellant complains that his trial counsel did not seek rulings from the trial court on these motions and did not file any pre-trial motions of his own.

We may not speculate on a silent record, however, as to whether such rulings were necessary. *Wert v. State*, 383 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Absent a record regarding counsel's trial strategy, we may not speculate as to why counsel did not file discovery motions, interview State witnesses, or file a motion in limine."). By the time that trial counsel might have

27

sought a ruling, the State might have already complied with the substance of the discovery motion and request for notice; and motions in limine, whether granted or denied, do not preserve error. *See id.*

Further, appellant does not assert that any specific motions should have been filed by his trial counsel. A decision not to file pre-trial motions does not categorically constitute ineffective assistance. *See Mares v. State*, 52 S.W.3d 886, 891 (Tex. App.—San Antonio 2001, pet. ref'd).

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he "unreasonabl[y] submitted another lawyer's pretrial motions and then failed to request a ruling on the motions."

### *Variance*

In regard to appellant's assertion that his trial counsel "failed to identify and preserve error [regarding] the variance between the indictment and the jury charge," he argues that the jury charge "diminishe[d] the State's burden to prove the allegations as set for[th] in the indictment" because the indictment alleged that he acted "intentionally *and* knowingly," while the jury charge required a finding that he acted "intentionally *or* knowingly." (Emphasis added.)

"It is well established that the State may plead in the conjunctive and charge in the disjunctive," whenever the statutory language is disjunctive. *Cada v. State*,

334 S.W.3d 766, 771 (Tex. Crim. App. 2011). Courts have specifically upheld challenges to jury charges where indictments alleged that offenses were committed with the culpable mental states of "intentionally and knowingly" and the jury charges authorized a finding of guilty if the defendant acted "intentionally or knowingly." *Zanghetti v. State*, 618 S.W.2d 383, 387–88 (Tex. Crim. App. 1981). The unanimity requirement is not violated when a jury has the option of choosing between alternative modes of commission. *Pizzo v. State*, 235 S.W.3d 711, 715 (Tex. Crim. App. 2007).

A person commits an offense of aggravated sexual assault of a child if the person "intentionally *or* knowingly . . . causes the penetration of the anus or sexual organ of a child by any means." TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i) (Vernon Supp. 2014) (emphasis added). Because the statutory language is in the disjunctive, the State properly charged the requisite culpable mental states for the offense conjunctively in the indictment, and the trial court properly charged the jury in the disjunctive. *See Nickerson*, 782 S.W.2d at 891; *see also Barrera v. State*, No. 01-03-00102-CR, 2004 WL 637954, at *6 (Tex. App.—Houston [1st Dist.] Apr. 1, 2004, no pet.) (mem. op., not designated for publication).

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he "failed to identify and preserve error in the variance between the indictment and the jury charge."

29

*Punishment Phase*

Finally, appellant argues that his trial counsel's performance was deficient during the punishment phase of trial because he did not present any mitigating witnesses. Appellant asserts that his wife and children were available and willing to testify as to his good moral character. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp. 2014).

Neither the defense nor the State presented any witnesses during the punishment phase. There is nothing in the record, however, regarding whether defense counsel failed to investigate the availability of any potential mitigating witnesses or conducted an investigation and concluded that the witnesses discovered would not be favorable. *See Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (declining to conclude counsel ineffective where no record from which to determine whether counsel acted reasonably in not calling any witnesses). Appellant's trial counsel may have determined that subjecting appellant's family members to cross-examination would not be in appellant's best interest. *Gaston v. State*, 136 S.W.3d 315, 322 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd) (stating whether to present witnesses is largely matter of trial strategy).

Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that he did not present any mitigating

witnesses during the punishment phase of trial. *See Martinez v. State*, 449 S.W.3d 193 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Rodriguez v. State*, 292 S.W.3d 187, 190 (Tex. App.—Amarillo 2009, no pet.) ("Without record evidence of what, if any, mitigating evidence was available to appellant and counsel's reasons for not offering such evidence as existed, appellant is unable to overcome the presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").

We overrule appellant's first and second issues.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Huddle.

Do not publish.   TEX. R. APP. P. 47.2(b).